Good morning, your honors. May I please the court? My name is Patrick John Guile. I represent the appellant, Wells Wyatt, in Banner Bank v. Wyatt. The issue on appeal here is whether the court properly held that the debtor did not maintain adequate records, thereby denying a discharge pursuant to 11 U.S.C. 727. Is the issue exactly whether he maintained the records or whether he, in the sense of putting things down, or kept them in his name, or in the usual sense of the word, i.e. there were the assailant documents, but he apparently didn't keep them, or at least he didn't produce them. And that seems to be the core of the case, because you never mention these settlement documents at the district court, the bankruptcy court. You put all the emphasis on them as just your opinion, so we're kind of not talking to each other very much. Well, and I'll tell you that the settlement sheets, if they were the record, I would have cited to them the testimony. Well, and the issue that, I guess, the appellant has is, where is the side of the record that shows that Waltz Wyatt put so much emphasis on these settlement statements? I think that that's one of the errors in this record, is to say, well, your own client, Waltz Wyatt, is coming and saying, oh, the settlement sheets are really the one record that is most important to show all of the financial records in this case. And that's just, that's incorrect. That's not... Is there anything in the record that shows where they were and why they didn't still exist? Did he keep one of the people in the laptop where they part copies, or what's the record show on the settlement sheets? Well, I guess I can back up and explain the record keeping in this case. I just actually want to... Waltz Wyatt. Say that again. I just actually am looking for that question. Is there anything in the record about what happened to the settlement sheets that the bankruptcy court said were missing? They all would have been on the laptop that Candace Cooley took with her. That's not in the record. The record is that Candace Cooley took the laptop. Yes, but the settlement sheets were... Why would the settlement sheets be in the record, correct? But aside from why, is it in the record that they were? I don't believe that the record shows that the settlement checks would have come from an entity known as Timmerman. So, Timmerman would have created these settlement sheets that would have been emailed to Candace Cooley. No, they would have been sent in the mail. We don't know. Exactly, and there's nothing in the record that any of the documentation was sent in the mail from Timmerman. The record is that they were emailed. The records for these were emailed, and whether that's a settlement record or that is the documentation... It should have been fairly easy to go get them and quote, keep them for purposes of bankruptcy, but they never show up in the records that are produced. Well, that's why I didn't produce them. That's why you didn't produce them. That seems to be the central problem here, the one that you completely ignore in your briefing. Because they're the ones that seem to demonstrate, with any degree of accuracy or reliability, what the relationship between these two people was. That's the problem. The problem is that... Go ahead. No, and I think that that's the point that I make in my briefing, is there's an overemphasis on these settlement sheets. These settlement sheets wouldn't by themselves show the financial condition of this debtor. Let me ask you something. I want to ask a yes and no question. So here's the yes and no question. Is there something in the record that reflects that the settlement sheets were on the laptop that the ex-girlfriend took? Yes or no? Not at all. No. Okay. Thank you. Okay. So, Your Honors, obviously, as the Court's aware, this case is about documentation, but it's not documentation in a record. And in this case, really, what 11 U.S.C. 727 provides for is that the debtor can't hide behind chaotic records or no records and still receive a settlement in this case. I think it's also important to understand that the documents can't be looked at in a vacuum. And to say, well, this one record, we're going to put the entire discharge on one record, which the Court is the one that determined would be the important document, not the debtor, not Wells Wyatt. And so I think that the Court needs to look at all of the records in this case, not just the certificates. The debtor also provided taxes. The debtor provided financial statements, which were provided by his CPA. The debtor provided e-mails regarding subordination agreements. I think the bankruptcy court said that the borrowing-based certificates really didn't say in any good way what percentage of the various lots Mr. Wyatt owned. And that's why the settlement sheets were important, because they would have. Is the district, was the bankruptcy court wrong that the borrowing-based certificates didn't accurately describe the percentage of ownership Mr. Wyatt had? The district court, yeah, they made that decision. But yes, I mean, I do believe that they're wrong. And if you look at all of the borrower-based certificates, they're all generally set up in the same way. It's a fillable form that was filled out, and it lists all of the information in the same way on each of the borrower-based certificates, including, and by way of example, I look at extra record 392, and each of these borrower-based certificates, each of these borrower-based certificates have the head in the herd, the type of cattle in the herd, the location of that lot, the owner of the fee lot, the lot numbers, whether they're owned or not, and when I say partnered, partnered with Jimmerman, the weight of those cattle, the price, the total, and it specifically has a percentage owner. By way of example, 392 is something different. This would be a palance extra for the record at 392. And so on each of these borrower-based certificates, it does specifically list the ownership interest, and it follows through to the net value with appropriate reasoning. So if you look at the very first line on 392, you've got 1588 head of heifers located in Sterling, Colorado. The price of those cattle is on a $500 per head profit estimate, and then it just kind of extrapolates out the total value of that herd at 794, and then Wells' 50% interest would be 397, and then all the way over on the right hand, it simply tallies those. And to be candid, that's... And that's basically what it's doing. It asks the key question of what the division is between Jimmerman and him. It basically says 50% all the time. Exactly. But I thought the record indicates that that may be true of the profits, but doesn't indicate the equity. So it's just not an asset determination. I don't think I understand the question, but the borrower-based certificate doesn't state, well, again, on 392, that cow is not worth $500, that the estimated, and all these are estimated, and that's clearly in the record, the estimated profit... Are you with me, Your Honor? It says percentagle, and then it says 50%. It's the variance terms of 100%, with 33%. Yeah, and so the valuation on this borrower-based certificate is based on the estimated profit that that cow is going to make. So that's the problem, isn't it? The problem that we don't have any education on this borrower-based certificate is our education of the ownership interest of cattle. And that's... the ownership interest is... it's an ownership interest in the profit of the cattle, not of the cattle's... But I thought there was also an ownership interest in the stock, and that's what's not on here. And that is necessary to understand. I mean, what I'm learning about the cow business now is minimal, but my understanding is that the main objection was this tells you nothing about what its assets were in the stock. When you say stock, are you referring to cattle, or are you saying... Cattle, cattle, cattle, cattle. Okay. I disagree with you, Your Honor. The... it's all rolling stock, or non-bred stock, which means that these are slaughtered each year, and the estimated profit is... In other words, some of it is, and some of it isn't. Exactly, and that's all disclosed, though. So you'll see that there's bred stock and non-bred stock. Right, so as to the bred stock, which is long-term, there is no indication of the ownership interest. Is that right? Therefore, the estimate should be calculated. No, there's still... You've got a percentage. Who owns the value that's listed on the borrower base certificate? Well, the percentage, which is not the percentage of profits you use, but a pointer in the round. You tell me that the percentage of profits, and now you're saying the percentage is the bred ownership. That's because it's a different type of cattle, and I very much understand that courts struggle with different types of cattle. There are several different kinds. No, you're saying that on the borrower base certificate, when it says percent owned for the breeding cattle, that means the percentage, not the percentage of the profit, but the percentage of ownership interest. Correct, and you have to look at the way these are valued, and if so, if you look at the price column on a borrower base certificate, and you and I wouldn't understand this without testimony from somebody that's in the cattle industry. So, the price, so you look at the first two rows, and you've got $500, and then you've got, and that's, that's, we think we're going to make $500. The final base, for example, is 391. That's where I was having problems, and I got to look at 391. Your Honor, 391 is the borrower base certificate for October of 16. These are set up the same way. I was referencing July of 16. If it was a document, that's a completely different document. Okay, I'll repeat. Are you talking about the page number at the bottom, or the ECF number? I'm talking about on the bottom right-hand side. Thanks. Okay, so I'll look at what 391 is, but it's the same, it's the same analysis. So, you've got a price, $500. This is all in the record of testimony. $500 is what they think the value is going to be for that particular cattle. Then you look at the price per pound of $1.60. I understand all that. I understand all that. What I want to know is what the percent of all meat. So, if you've got $500 that you're going to make on after the slaughter of this animal, well, that's why it gets 50% of that. That's the profit. You're not wandering around. That's profit. That is not the percent of ownership in the breeding stock. Because he never had ownership of the cow. He didn't. No, he has an ownership of these cattle. I thought he was investing money in it. He was getting a percentage of the profit, but he was also investing in the stock. That's the bread stock. Right, that's the bread stock. And again, this is all part of the record. So, if you look at the bread stock, that herd is valued differently. I know. And his testimony supports this. Yeah, but it says percent only. And what does that percent only mean for the bread stock? Fifty percent. In other words, he invests just 50% and he gets the 50% of equity in that stock. Yeah, and if you look at the valuation, now we're looking at a $1,500 animal. So, this animal, it is a profit or loss. This animal is worth $1,500. And he does own that. And that is his testimony. So, can I sum up what I think you're saying so you can tell me if I'm right or not? So, we got two types of stock. We got the rolling stock and we got the bread stock. The rolling stock is going to get slaughtered. And so, it doesn't matter how much he owns of the cow. It matters how much he owns of the profit, the income that's going to be earned from the cow. Right so far? That's a non-breeding rolling stock, yes. Okay, and so the percentage for the borrowing-based certificate for that kind of cow is the percentage of ownership of the income that's going to be earned, which is the relevant point on that. Am I right so far? Exactly. Okay, now I'm going to turn over to the breeding stock. On the breeding stock, what's relevant is how much he owns of the actual asset, not the income, the asset. In other words, the cow. And you're saying that the borrowing-based certificate percentage for the bread stock is how much he owns of the cow. Is that right? Exactly. I have one more question and then the other question is that on the bread stock, does one earn, on the breeding stock, does one earn income from that? Do you rent out the cow for, I don't know how it works. No, no. In the beautiful West, it's a large herd of cattle. And that herd gets larger and larger and larger. His percentage of ownership of that cattle stays the same. Okay, thanks. So what you're saying is one would not know that for one-page piece of paper because it says percent hold. It does distinguish between the breeding stock and the borrowing stock. So it doesn't say that some of these numbers mean a percent of profit and other that's the mean percentage of assets. You're now saying that that's the case and that somehow that the bank or the economy was supposed to know that and the bankruptcy court was supposed to know that. And the record supports the conclusion that that's true. Or what the bankruptcy court seemed to think is that it wasn't true that these numbers, 30% of ownership was not true. And unless you had the settlement statements, they couldn't know what the actual ownership interests were. Now you're saying that's incorrect. I think what the court's holding was is what the court wanted to see in the record was we're going to slaughter all these animals at the end of the year. And there's going to be a master accounting of we slaughtered this animal. The estimate was $500. We got $300. And that should be in the record on each year. And my response to that is that would be nice. But that was never required by Banner in a decade-long relationship with Wells Wyatt. And therefore, the borrower-based certificates, as explained, every single month those borrower-based certificates explains to the court the value of Wells Wyatt's assets in this case. All right. Your time's up. And we'll give you a minute. We're going to very humbly thank you. Sir? Thank you, Judge. I'll jump right into it. It's important to consider the standard review here. We're talking about fair error. And as to the settlement sheets, as to this particular point, the bankruptcy court's decision. Fair error as to the underlying facts, right? I mean, one sort of generic question is let's suppose that these, the borrowing-based documents were accepted by the bank all these years. I mean, there is a sort of main switch problem here, which is the bank accepted all this as sufficient. And now that this is a bankruptcy, they're saying they're insufficient. And the question is if, let's say these borrowing-based certificates, you know, aren't so common, and maybe even they're not even accurate, but they are records, and they were kept, and they were what was relied on by the parties here. And why is there an obligation to do more than that? Well, there are... I mean, you can now attack the accuracy of them for purposes of litigating what the actual assets were, but that's different from not having records. Well, we can, I guess, in terms of relying on the borrowing basis and extending credit, I mean, at that point, I mean, we don't know what we don't know. We're getting borrowing-based certificates, and there's sort of backup data. Just to time out, it's the same $2 million that you loaned, right? So the point is that if these borrowing-based certificates, which the bank prescribed the format of and accepted, were good enough for you to loan the $2 million and keep this credit going for a fairly extended period of time, the bank's really the only real party at issue here. Why aren't they good enough when it comes to kind of unwinding the business through the bankruptcy? You were good enough for you when you were loaning the money. Why aren't they good enough for you when you're collecting the money? Well, I mean, the problem is that, I mean, again, we don't know what we don't know. I mean, if they aren't performing... That would have been true when you were getting them, too. Did anybody ever look at these things at the bank or go back to Mr. Wyatt and say, hey, these things aren't good enough? No, I think what they were looking at is saying, look, this guy has a huge asset base. He's going to form a loan under the loan. What's the problem? So that's, again, a question of the accuracy of these documents. The document, the borrowing-based document has a percentage of ownership, right? You're now saying, well, it wasn't true because he really didn't... He mixed up percentage of profit and percentage of assets, and it was not an accurate number, but it's a number. It's on there as to what percentage he owed. So why isn't this a problem for litigating what was underlying these records rather than saying you don't have records? What we're saying is the records we have. I mean, the 72783, Congress says you have to keep adequate records that would allow a creditor to have a snapshot into the person's finances. When we look at these borrowing-based certificates, they sort of crumble upon examination. I would like to direct the court's attention to 3SER395 through 396. It's an amazing exchange between Judge Meyer and Wells Wyatt. Wells Wyatt is explaining the double financed. He's got an equity piece in the cow and then a profit base in the cow. And Judge Meyer literally said to us, Mr. Wyatt, where in this document is that worth of arrangement reflected? And he says it's not. What's that page again? The other thing I would note. What was that page again? I'm sorry, you said the page pretty quickly. What was it? Yes, 3SER395 through 396. It's where he says, literally, the arrangement on the non-grading stock is not reflected in any of the borrowing bases. I'd also note that you've just... Non-grading stock isn't reflected, but there are percentages there. He's telling us the percentages of the percentage of profits. So, I'm not sure what was that. Well, right. But when you look at the borrowing base, the issue of why Wells Wyatt says it's not there is because it says percent owned. Everyone on this call... Right, and so it's, in that sense, not accurate. But he's now standing up and saying, well, actually, for those just the percent ownership and it's profit, that's not keeping records. I mean, it's a big... They're not as clear as they could be, but he's now explaining them and saying that there were... That it makes X, in this instance, the Y in that instance. So, that's very easy to plug in. So, what's the problem? Well, the problem is, is that the... I mean, the 7273 requires the debtor keep and preserve accurate records. These records are not accurate for him to come back and say, well, by the way, this is what I actually met. It doesn't work. The other thing I would notice, if this goes to R285, this underscores... But they're accurate if you have this clause on them. I mean, or if they're not accurate, that is because he's keeping four of them. His records are wrong and you can litigate them. But he's now focused on the means, i.e., when it's a breeding stock, it means assets, and when it's not a breeding stock, it means profits. So, that's easy now to deal with on these documents. Now you're saying, but they're not accurate. Is it really true that he owned 50% of the breeding stock? Go ahead. Let me expound. Let me expound. The accuracy is not just limited to the relationship with a non-breeding stock. If you go to 4SER95 and 3SER275 through 285, that talks about what's called the Squaw Valley deal. The Squaw Valley deal was a huge loss for Wells Quiet. Yet, if you look at all the borrowing bases in 2016 to 2017, those are all listed as a profit. So, effectively, what he's saying is, this borrowing base is not just inaccurate because it doesn't reflect the profit loss on the non-breeding stock. It also doesn't reflect the Squaw Valley loss. The other thing I'd note is if you got, excuse me, guys, if the court looks at bar 285 and looks in the left-hand corner, it's going to see ewes. Ewes are sheep. White livestock doesn't own any sheep. And so, literally, if you look at the borrowing base, it's not just one inaccuracy. It's a mountain of inaccuracies because the ewes are not part of Danner Bank's borrowing base. They're not owned by Wells Quiet Livestock. And so, we have a collateral base that doesn't even include our collateral. So, if we are looking, as a creditor, to records that are trying to justify what a creditor would want to see, this just doesn't come in. The other thing I want to point out- If a creditor did see all this, would you worry about it or whether we're lending the money? I mean, that's exactly right. I mean, obviously, if Danner Bank knew the situation in 2016 and 2017, the situation would be quite different. Danner Bank relied on their borrowing bases to the degree they could have done more. That doesn't mean they didn't do enough. And it doesn't alleviate Danner's obligation, as imparted by Congress, to keep adequate records to justify his time in the bankruptcy and at a reasonable time in the past, as the Bankruptcy Court noted, as to the settlement sheet specifically, which I would note, Mr. Guile, is not correct. Candace Cooley and Wells Wyatt testify over and over regarding the importance of those documents and what goes into them. I direct the Court's attention to 2SER86, 2SER92, where Candace Cooley says they have, quote, what is it, anything you can imagine, 4SER525-528, 4SER532-533, 4SER633. The record is littered with statements as to what goes into these settlement sheets. The other point I want to make is, you know, it's not just limited to the lack of settlement sheets. Another point that animated the Court's decision and why it's not under error is- Wait, was I just covering this case? I believe so. All right, did the Bank ask for settlement sheets? I believe so. And what happened? According to Judge Meyer, there was no settlement sheets for 2016 and 2017, which is the critical period of time. I mean, they were asked for, but not produced. Exactly. To my knowledge, they're in there, not on the record. But the point I wanted to make is- Do you have another case in which you had, just focusing on the borrower-based statements, you know, extensive- There were extensive records. They may have problems, but there were records that the creditors used to provide upon it. And if you believe that would be sufficiently informative, the problem is that you're saying they're not right. Is there any case in which under 727B3, that was determined to not simply generate a, for example, a discovery problem and a fighting against them on the merits of what their assets were, but a refusal to discharge records? I'm not aware of any such case, Your Honor. Because ordinarily, when this provision is invoked, it's because there aren't records, not because there are poor records or questionable records. That's not accurate. In rate cannabis, it's not quite the fact pattern. You elucidated, but in rate cannabis, the case, in a sense, it's the quality of the records, not the quantity of the records. And I think the line that the court set was- But the quality, meaning what does the court just show, just purported to show what his ownership interest is? You're just saying it was wrong? Yeah. Not that it didn't. The court just showed his ownership interest. It's right on there. Well, I guess, Your Honor, I mean, if we look at 285, the asset base is 3.5 million. All we're asking is, where did it go? Because two months later, Wyatt Livestock, Wyatt declares bankruptcy and lists his interest in Wyatt Livestock as zero. But the question is, why isn't this being litigated on the merits against him? Because he hasn't demonstrated aware of rent, rather than with regard to whether he gets a discharge or bankruptcy at all. Well, because that's what 7273 is. Well, I understand that, but ordinarily, when you're trying to figure out what his assets are, you have a trial. You figure out what his assets are, and if he can't demonstrate what his assets are, then the due judge can make a determination against him that he didn't have these assets and he was lying about them. But, or not lying about them, but why is that a question of not getting a discharge, as opposed to a merits determination as to what is available for the credit? Your Honor, there was a state court litigation with the Timmermans, so it's not as though the bankruptcy, the better bank just had bankruptcy and just said, this is where I'm going to exert all my rights. There was a state court matter that was litigated with the Timmermans. I don't know if it was contemporary, I think it was contemporaneous, but it's also- That's another question, why couldn't you subpoena the Timmermans and get these arguments? Well, I don't think that's my obligation. It's the debtor's obligation to do it. If the debtor wants to keep adequate records, he has to send a subpoena to the Timmermans and say, hey, I don't have any records. The records I do have all have Banner Bank's base numbers on them, which means that I don't have adequate records. Can you give me the documents for 2016 and 2017? They didn't do that. They're not on the record. Counsel, what's our standard of review here? It's clear error for the findings of fact and de novo review for the identification and application of the law. And one thing I do want to know, and this sort of cuts both ways, the Bank State Court was not just animated by the Selma sheets. It really said, hey, under questioning, I asked Wells Wyatt, or Mr. Peterman asked Wells Wyatt, where are these cows? You had a $3.5 million asset base in August of 2017. What happened to that? And he said, the cows are being cows, which suggests that they're out there somewhere. But Wyatt was sort of, I guess, completely indifferent to that. So the court looked through the record and tried to find something that could say, what's the disposition of the breeding stock, the non-breeding stock? The judge monarch didn't find anything. The one thing I did find was at 367 of the record. It's sort of buried in an exhibit. It purports to state the value of the breeding stock. However, it's not a settlement sheet. It's not a profit loss statement. There's no talk about the ghost figure. There's no talk about the weight. Further, Wyatt didn't argue this document, although I would just note that you can even assume this document as a complete and accurate appraisal of the breeding stock. It doesn't take away from the fact that we don't know what happens to the non-breeding stock. Again, this person's asset base went from $13.5 million to zero. All we want to know is, where are the records that trace these transactions? Where are the cows? What's their disposition? And we don't have that. Now, the two points I do want to make as to the justification for not keeping adequate records, because this is a two-part analysis, is although the court didn't go through all the Cox factors, the court specifically addressed the factors that Mr. Dial raised, which is a purported lack of sophistication. However, the bankruptcy court specifically touched on Wild's Wyatt's lack of sophistication on page 21. Instead, he wasn't educated. The court also went through what a reasonable ranch would do in those circumstances. And again, I do want to emphasize that regardless of Wyatt's sophistication, all we're asking is, is where are these records? But it really doesn't have to do with sophistication. These stuff didn't exist. They weren't produced. And it seems to me that has to be the focus. I mean, he didn't not... I mean, these records were not kept by him, but they were kept to me. And so he didn't have to read to it himself a second time. They existed. And so certainly, his excuses don't apply because the records existed. On the other hand, is the fact that they weren't produced at this time. I mean, in order to fit it into the statute, you have to say he didn't, quote, keep them, right? It's not that they weren't maintained, unlike in Canova, Geneva. They were maintained. They just weren't produced. I don't think they were maintained. I mean, the issue is we have the laptop going away. Well, I mean, maintained in the sense that they were maintained in the sense that they were recorded at one point. They existed at some point. He presumably had them at some point. Presumably. And in the 2016, 2017 timeframe, that's the critical issue. Wyatt operated Wyatt Livestock before Candace Cooley. He operated during that 2016, 2017 timeframe. He can't blame a laptop at that point. All he needs to do is delete records. And we just don't have them. Well, this keeps the records that existed. I don't know if we have any evidence. It seems a fair inference that he had these. He either has an email or a piece of paper at some point.  Okay. Thank you very much. Your time is up. Thank you, Judge. Yes, you have one minute. Most importantly, the question is, where did it all go? And I think that that's centered to the court's analysis here. Where? Why don't it all go? At the cows or at the pigs? Where did it all, where, where, where? Mr. McLaughlin said, well, the arguments, well, you had all these cattle. Where did they all go? And explain that to me. And Will's Wyatt prevailed on the 11 USC 727A5 action. That, how can, how can this court say, you successfully explained all of the loss of all of these cattles and where they are. But your records don't really help us with that. And I think the court needs to analyze those two rulings together to, to show that on the de novo review, I don't think this court applied the appropriate law to the facts. And I think that that ruling by itself really strengthens that. I think you also look at the other rulings in this case. 1127, under 727A2, 1127A4, and 1127A5, the debtor prevailed. The debtor also prevailed on the 523 actions, which are fraud specific to a creditor, as to three of the four loans in the lawsuit. What was the basis for finding that he didn't, he, that, that he wasn't liable on trade fraud?  What happened to these cattle and why there was a loss? The, the loss was the substantial decrease in the cattle market in the second half of 2016. The debtor testified that he thought he was going to receive a $700,000 profit. That information is on the BBC's from 2016, and instead had a $50,000 loss. So the court relied on that, in addition to the reliance on where all of the equipment was in this case, and the real property, in ruling that the debtor, the debtor explained satisfactorily the, any loss of assets or deficiency of assets to meet the debtor's liabilities. So in my briefing, I go into the, the, what should be a good faith element. Can I ask whether it is true that the, in discovery, there was a request for settlement statements? I'm sure, I do not recall a specific request for settlement statements. I, I would, I would assume that in discovery, there was a, there was a request for all documents related to the cattle, and all of those documents were produced, and there was no, Oh, they weren't produced, because we know these settlements and settlement statements existed, and they weren't produced. I'll correct it. All of the records that Wells Wyatt had were produced to ban, to ban or ban through discovery, and there was no motions to compel. There was no discovery litigation in this case, because Wells provided all that information. Okay. Your time is up. Thank you very much. Thank you all. To the case of Wyatt versus Besson, I think there's something that we'll take a short time. There's a section for questions. There's a section for questions.
judges: BERZON, RAWLINSON, Kennelly